DRESSER INDUSTRIES, Appellant, v. THE INDUSTRIAL COMMIS-
SION *et al.* (Ronald Zelenko, Appellee).

Second District (Industrial Commission Division)   No. 2—91—1049WC

Opinion filed October 8, 1992.—Rehearing denied November 30, 1992.

STOUDER, J., joined by RAKOWSKI, J., dissenting.

Mark A. Braun, of Braun, Lynch, Smith & Strobel, Ltd., of Chicago, for appellant.

Martha A. Garcia, of Katz, Friedman, Schur & Eagle, of Chicago, for appellee.

JUSTICE H. LEWIS delivered the opinion of the court:

Claimant, Ronald Zelenko, filed an application for adjustment of claim pursuant to the Workers' Occupational Diseases Act (the Act) (Ill. Rev. Stat. 1983, ch. 48, par. 172.36 *et seq.*), for hearing loss in both ears incurred through his employment with the respondent, Dresser Industries. Following the hearings on his application, the arbitrator held that the claimant failed to prove that he was exposed to an occupational disease (*i.e.*, loud factory noises) sufficient to cause permanent hearing impairment and denied the claimant benefits under the Act. On appeal to the Industrial Commission (the Commission), the Commission reversed the arbitrator's decision and held that the claimant's last date of exposure to an occupational disease was on May 23, 1984, and, as a result, the claimant had suffered a 33.37% permanent bilateral hearing loss. Subsequently, the circuit court confirmed the decision of the Commission, and the respondent appeals.

While the respondent presented several arguments in its brief, the primary issue presented was whether the Commission's decision that the claimant suffered permanent partial hearing loss of 33.37% in each ear due to his exposure to loud noise levels during his employment was against the manifest weight of the evidence. We affirm.

Two hearings were held before the arbitrator on the claimant's application for adjustment of claim. The first hearing was held on December 9, 1985, and the second hearing was held on March 12, 1986. At these hearings, the following evidence was presented. The claimant testified that he had been employed as a welder by the respondent since November 1, 1982, when the respondent took over the Libertyville plant from International Harvester. Prior to the takeover of the plant by the respondent, the claimant had worked for International Harvester since 1970. In 1978, while working for International Harvester, the claimant was assigned to department 330 as a welder, and he had continued in this capacity when the respondent bought the plant in 1982.

As a welder in department 330, the claimant was assigned his tasks by the supervisor upon his arrival at work. Usually, the assignments were made daily; however, sometimes the assignments were made weekly, depending on the size of the job. The types of welding done in department 330 were table welding, submerged arc welding, wheel welding and axle welding, and over the years, the claimant had performed each of these jobs. The claimant explained that, in table weldments, welding was done on small parts which could be placed on the table. Table weldments also required chipping and grinding as needed. A chipping operation involved using a chipping hammer, a chisel driven by an air impacter, to knock off small weld spatters around the outside of the weld. He further explained that if the chipping hammer did not remove all of the weld spatters, then a pneumatic stone grinder was used to grind off the excess steel. The claimant stated that the noise made by a chipping hammer was like a "drummer playing drums real fast, only steel, [sic] on steel." The sound created by the pneumatic grinder was a loud, abrasive sound from grinding the steel down. Because of the noise created when performing chipping and grinding operations, the claimant was unable to talk to co-workers two and three feet away unless he yelled. According to the claimant, it was impossible to talk on the telephone in the department when chipping and grinding were going on, because you could not hear to talk. The claimant stated that between 1981 and 1984 he also did air arcing, which involved the use of a carbon rod; through a combination of air pressure and electricity, the weld was melted and then was blown out under high air pressure. The noise created by an air-arcing operation was similar to a jet engine and was much louder than the chipping and grinding operations.

The claimant gave examples of table-weldment work he had performed while employed by the respondent. The claimant estimated that between 1981 and 1984, 50% of his time was spent on jobs that required chipping and grinding operations. The other half of the claimant's time was spent on submerged arc welding and automatic welding, two operations which did not require the use of a chipping hammer but involved hand chipping. The claimant stated that department 330 was approximately the size of the room where the arbitration hearing was being held, a space of about 30 feet by 40 feet, and, in this room, there were five tables for table weldments.

The claimant further testified that on February 15, 1984, the respondent had each of the employees in department 330 wear a "sound pressure meter type of device," which was hung around their necks to measure the level of sound in the department. On the date of this

testing, the claimant was assigned wheel welding, a task which involved no chipping and grinding. The claimant stated that the jobs performed by the other employees that day also involved very little chipping and grinding.

In May 1984, the claimant's supervisor, Charles Ostersgard, notified the claimant and his co-workers at a group department meeting that the employees in department 330 were now required to wear hearing protection. The claimant recalled Ostersgard telling them at this meeting that the test results of the February 1984 noise survey indicated that the noise levels exceeded 90 decibels and that this level of noise was bad for their hearing. After May 23, 1984, hearing protection was issued to the workers, and the claimant wore the hearing protection when performing chipping and grinding operations.

About two or three weeks after the mandatory hearing protection was instituted, the claimant, as union steward for the employees, approached Mr. Webb, the plant safety supervisor. The claimant told Webb that the workers did not want to wear the hearing protection as the hearing protection was uncomfortable. According to the claimant, Webb told the claimant that the test results showed a noise level of over 93 decibels and that this level of noise can cause hearing loss; therefore, the workers had to wear hearing protection. It was the claimant's understanding that it was the respondent's policy that persons working in high noise-level areas must wear hearing protection.

The claimant testified that he first noticed problems with his hearing when he was in the army between 1966 and 1968. When the claimant started work for International Harvester in 1970, International Harvester gave him a hearing test. He had another hearing test in 1972, and he had had several more hearing tests since that time. His latest hearing test, given by the respondent, was approximately one month prior to the arbitration hearing. The claimant denied having a head injury before or after May 23, 1984. In 1981, the claimant saw Dr. Goldstein for his hearing problems. The claimant again saw Dr. Goldstein in 1984, as he noticed that his hearing was terrible. At present, the claimant stated he does not hear well and his ears "ring a lot," but the claimant further stated that the ringing had been present for the last three or four years.

Glenwood Webb testified that he is the supervisor of security and safety for the respondent and that he has held this position since the respondent acquired the Libertyville plant in November 1982. Prior to that time, Webb had been safety supervisor for International Harvester since March 25, 1977. Webb's responsibilities included involvement in noise-level studies that had been conducted at the Libertyville

plant. Webb corroborated the claimant's testimony that noise-level readings were taken of the employees in department 330 on February 15, 1984. He also stated that additional noise-level readings were taken of the claimant and the areas surrounding him on January 9, 1986; on January 13, 1986; on January 16, 1986; and on January 21, 1986.

Webb testified that the information provided in the audiodosimeter noise-survey report of the claimant done on February 15, 1984, indicated that the claimant was exposed to at least 115 decibels of noise during the workday. The report of a similar survey done on the claimant on January 21, 1986, also indicated that the claimant was exposed to more that 115 decibels on that day. However, Webb knew of no operation in department 330 which would produce a noise level of 115 decibels other than the air-arc-gouging operation. He explained that the dropping of a sledge hammer or the blowing of a whistle can cause an instantaneous reading of 115 decibels on a dosimeter. He also admitted that if chipping and grinding operations are done in a "bucket," this too can produce a higher noise level of up to 115 decibels. Webb admitted that a noise survey done on October 11, 1979, revealed that the claimant was performing an air-arcing operation, and, in so doing, the claimant was exposed to 113 to 117 decibels that day. Webb pointed out that the claimant was wearing ear plugs when performing this work, and that a curtain was used which reduced the noise level to 103 to 105 decibels. Webb admitted that the air-arcing operation was one of the functions of department 330.

Clarence Ostersgard testified that he had been employed as a welding supervisor by the respondent since November 1, 1982, but that he had worked for International Harvester since 1973. As a welding supervisor for departments 330 and 920, Ostersgard assigned jobs to the employees on a daily basis. He stated that in 1982 work was very slow and there were only two welders in department 330. In 1983, the number of welders increased to four, and in 1985 the number of welders increased to six.

Ostersgard recalled that in 1982 the claimant was assigned primarily to booth 909 in department 330; however, the claimant moved around to other booths, and the claimant also had worked in booth 901, in booth 903, in booth 904, and in booth 1108, all of which were in department 330. In booth 909, the claimant worked on small weldments such as 540 front-end-loader ladders and 412 levers. The work on 540 front-end-loader ladders took approximately a half hour on each piece, and there was chipping and grinding required of about five minutes per piece. Ostersgard described chipping as follows:

"[C]hipping is chipping ding balls off as needed. Ding balls are weld balls that are made by the weld wire when it spatters." He also stated that grinding is done with a pneumatic grinder. Ostersgard described the 412 levers as large pieces weighing 40 to 50 pounds. He testified that there was a lot of chipping required on the 412 levers, approximately two to three minutes per piece, but that there was very little grinding required on the levers. According to Ostersgard, approximately ten 412 levers were welded in a day. In 1983, another welder, Richard Lucio, was assigned to booth 909.

Ostersgard stated that in the other booths where the claimant worked there was less chipping and grinding required. In booth 901, the claimant did pin welding, which was a sub-arc wire weld. In this operation, part of the welding was done in submerged sand, and only hand chipping was required to get off the flux created from the welding. The only pin welding which required chipping with a chipping hammer was a 560 pin, which is a large pin. A 560 pin was worked on at the rate of about one every six months. In 1982 the claimant worked in booth 901 less than a day per week; in 1983 the claimant worked in this booth about two days per month; and in 1984 the claimant did not work in booth 901 at all.

In booth 903, in which the claimant also worked, only sub-arc welding was done, and only hand chipping was required on the parts welded in this booth. Ostersgard recalled that the claimant worked less than a day per week in booth 903 in 1982, and in 1984 the claimant spent only three days of the month in this booth. In booth 904, the claimant worked on bucket-lining weldments. Ostersgard described this work as performing a boss weld on a large fixture and then performing a sub-arc weld. In the boss weld of a bucket-lining weldment, chipping with a chipping hammer was required of approximately three to five minutes per piece, and as many as 12 pieces were worked on in a day. The time spent by the claimant in booth 904 was less than a day per week in 1982, less than a day per week in 1983, and three days per year in 1984.

Another booth in which the claimant worked was booth 1108, wherein axle welding was performed. Again, this work mainly involved hand chipping instead of chipping with a chipping hammer. The time spent by the claimant in this booth in 1982 was less than a day per week, and in 1983 the claimant spent three days per week. In 1984 the claimant was assigned to booth 1108 almost exclusively.

One other booth in which the claimant worked from 1982 to 1984 was booth 295. In this booth, a rusted part was placed on an automatic table; the door was closed, and the machine blasted the rust off

of the part. In this area, hearing protection equipment was worn. The claimant spent less than a day per week in this booth in 1982, in 1983, and in 1984.

Lastly, Ostersgard admitted that the claimant performed air-arcing operations on seven or eight days from 1982 to 1985. Ostersgard believed that the claimant had performed an air-arcing operation within the first four months of 1984. Ostersgard further stated that an air-arcing operation lasts longer than 15 minutes and may take a half of a day or two days depending upon the job. Ostersgard described the noise from this operation as similar to a jet airplane and stated that the sound is constant while the equipment is being used.

Ostersgard corroborated the claimant's testimony that in May 1984, at a regular Friday morning meeting with the welders, he advised the workers that the wearing of ear protection was now mandatory in department 330. On cross-examination, Ostersgard admitted that he had a meeting with the welders every Friday morning and that during these meetings he often had to stop talking for two or three minutes until the noise in the background subsided. He explained that the noise was created by a loudspeaker which came on frequently throughout the workday.

Also on cross-examination, Ostersgard explained that when he used the phrase "chipping and grinding," this terminology was commonly understood to refer to using power machines, rather than to hand chipping. Ostersgard admitted that the claimant had used chipping and grinding equipment occasionally up until hearing protection was mandated in 1984. Ostersgard's description of the noise created by the chipping hammer was that the sound was a little quieter than a street chipping hammer. He described the noise of the grinder as being similar to a power saw.

Two letter reports from medical doctors were admitted into evidence. In Dr. George Goldstein's letter report of June 19, 1984, the doctor indicated that he first saw the claimant on February 18, 1981. At that time, the claimant complained of hearing loss and ringing in both ears (with the ringing worse in the right ear than in the left ear), which had been present since a blast injury in the army. The claimant told the doctor that recently his hearing was becoming worse. The claimant also told the doctor that he had been exposed to loud noises at work and that he had used ear protection occasionally. The claimant reported to the doctor that there was no history of hearing loss in his family.

Dr. Goldstein's examination of the claimant's ears revealed that the canals and tympanic membranes were normal and that the rest of

the claimant's ear, nose and throat exam was within normal limits. The doctor reported that the audiogram showed mild-to-moderate bilateral sensori neural hearing loss, which was slightly worse in the left ear than the right. The doctor advised the claimant that his hearing loss was probably related to noise exposure and that the ringing in his ears was the result of a cochlear injury. The doctor instructed the claimant to avoid loud noises and advised the claimant to have a hearing aid evaluation, as well as a yearly audiogram.

Dr. Goldstein next saw the claimant on June 27, 1984. The claimant told the doctor that he thought his hearing had decreased since his prior examination. The claimant stated that the ringing in his ears was persistent. The doctor's examination of the claimant again revealed that the claimant's ears were normal, and the audiogram had the same basic configuration as in 1981. However, the doctor noted there was a slight decrease in hearing acuity since his 1981 examination.

Dr. Goldstein reported that the claimant's audiograms from 1970 and 1972 were made available to him and that these tests showed a sensori neural hearing loss "which was not as severe as on our audiograms in 1981 and 1984." The doctor concluded that "[t]his would seem to indicate that the deterioration in his hearing is related to his noise exposure at work." In a supplementary letter dated January 7, 1986, Dr. Goldstein indicated that the claimant's hearing loss was irreversible.

In a letter report dated February 6, 1986, from Dr. George Allen, the doctor reported that he had seen the claimant on February 4, 1986. In this letter, the doctor related the claimant's history. The doctor noted that the claimant had worked for International Harvester since 1970 and for the respondent since its takeover. The doctor reported that the claimant had been in the service from 1966 to 1968 and that he had been exposed to "some blast noises" in the service. Following this exposure, the claimant had ringing in his ears. However, the doctor stated that the claimant had not noticed any hearing loss until the mid to late 1970s and, since then, the claimant's hearing had become worse.

Dr. Allen's examination of the claimant revealed that his tympanic membranes were normal, the tuning fork tests were normal, his speech-reception thresholds were consistent with pure-tone averages, his speech-discrimination scores were excellent and test reliability was good, and the claimant's tympanograms were normal. However, the audiogram showed that the claimant had bilateral symmetrical sensory neural-type hearing loss with high-tone notch. The doctor con-

cluded that the claimant's hearing loss was due to excessive exposure to noise. The doctor noted that the claimant's old audiograms indicated some hearing loss as early as 1970, but there was some gradual progression of loss until June 1984. Since June 1984, there had been no significant change in the claimant's hearing loss. The doctor found that presently the claimant has a rating of 39.4% in both ears. The doctor pointed out that in reviewing the audiodosimeter noise survey done on February 15, 1984, the results of that test indicated the claimant's exposure to noise was only a time-weighted average of 83.8 decibels. The doctor stated that "[n]oise exposure at this level is not great enough to explain the progression of his hearing loss. It must be assumed that he has been exposed to louder noise at other times."

Reports composed from audiodosimeter noise surveys done for the respondent in February 1984 and January 1986 were admitted into evidence. The reports from the February 1984 noise survey indicated that the time-weighted average of the workers' exposure to noise during that day ranged from 83.8 decibels (the reading taken from the claimant's survey) to 91.4 decibels for another welder in department 330. The reports from the January 1986 noise survey indicated that the time-weighted average of the workers' exposure to noise during the survey ranged from 78.4 decibels to 89.6 decibels (the claimant's exposure was indicated as a time-weighted average of 85 decibels on January 16, 1986, and as a time-weighted average of 85.9 decibels on January 21, 1986). Noise surveys from International Harvester from as early as 1972 and as late as 1979 were also admitted into evidence, and these surveys indicated that the workers were exposed to sound-level readings ranging from 82 to 120 decibels.

As was previously noted, from this evidence the arbitrator held that the claimant had failed to prove exposure to an occupational disease on May 23, 1984, and denied the claimant benefits. On review, the Commission reversed the arbitrator's decision and held that the claimant had suffered a 33.37% permanent loss of hearing in each ear due to exposure to an occupational disease at work on May 23, 1984, and the circuit court confirmed the Commission's decision.

On appeal, the respondent contends that the Commission's decision that the claimant suffered 33.37% permanent hearing loss in each ear due to exposure to an occupational disease at work on May 23, 1984, was against the manifest weight of the evidence. The respondent asserts that the Commission's decision is manifestly erroneous because (1) the claimant failed to show he was exposed to noise levels established by the statute to show permanent hearing loss; (2) the Commission relied in its decision on noise-level surveys done by

International Harvester, before the claimant was employed by the respondent; (3) the claimant failed to show that there was a causal connection between his hearing loss and his employment with the respondent; and (4) the claimant failed to show there was no increased impairment within two years of the date of last exposure as required by the statute.

The statute provides that a claim for hearing loss against an employer can only be brought if "the employee has been exposed for a period of time sufficient to cause permanent impairment to noise levels in excess of the following:

| Sound Level DBA Slow Response | Hours Per Day |
|---|---|
| 90 | 8 |
| 92 | 6 |
| 95 | 4 |
| 97 | 3 |
| 100 | 2 |
| 102 | 1½ |
| 105 | 1 |
| 110 | ½ |
| 115 | ¼" |

(Ill. Rev. Stat. 1983, ch. 48, par. 172.42(f).) Further, it is the Commission's function to determine if an employee has compensable hearing loss, and its decision will not be overturned upon review unless the Commission's decision is against the manifest weight of the evidence. *United States Steel Corp. v. Industrial Comm'n* (1985), 132 Ill. App. 3d 101, 477 N.E.2d 237.

We now address the respondent's first assertion that the claimant failed to show he was exposed to the noise levels required by statute to show permanent hearing loss. The respondent argues that the claimant did not show that he was exposed to the noise level for a sufficient time length as required in the statute, *i.e.*, that the 115-decibel level shown in the 1984 sound survey was only instantaneous and was not for the 15 minutes required by statute; that the claimant worked primarily at projects that only required hand chipping; that the claimant had worn ear protection on October 11, 1979, when the work he performed generated up to 115 decibels for an extended period of time; and that the audiodosimeter noise-level survey done on the claimant on February 15, 1984, showed that the claimant was exposed to a time-weighted average of 83.8 decibels. We disagree.

■ The evidence presented in the record of the instant case revealed that the claimant had spent up to 50% of his time, while employed by the respondent, on welding projects which required chipping and grinding, the primary sources of noise in department 330. When chipping and grinding operations were being done in department 330, the claimant had to yell at a co-worker two or three feet away in order to communicate. The claimant's testimony also established that the size of the room in which the welders did their tasks was approximately 30 feet by 40 feet in size and that there were five tables on which table weldment took place. Additionally, the claimant testified that in May 1984 his supervisor advised him and his co-workers that, from that day forward, the workers were to wear mandatory hearing protection because of the high noise level in the department.

Webb's testimony revealed that, on February 15, 1984, and again on January 21, 1986, the claimant was exposed to at least 115 decibels of noise during that day. Although Webb stated that the 115-decibel level may have been due to an instantaneous burst of noise, the respondent did not provide evidence that this was so, and Webb's testimony that the 115-decibel level was instantaneous and not sustained could have been disregarded by the Commission as sheer speculation.

Webb's testimony also established that a noise level of 115 decibels can occur when chipping and grinding are done in a "bucket," and he also testified that the claimant had performed air-arc welding, a task which generated a noise level of 113 to 117 decibels. Ostersgard, claimant's supervisor, corroborated that the claimant had done air-arc welding on as many as seven to eight days while employed by the respondent and that the air-arc operation can last for as little as a half of a day up to two days. Ostersgard described the noise created by this operation as similar to the sound of a jet airplane. The level of noise generated by the air-arc welding was sufficient to show that the claimant had been exposed to the statutory noise levels necessary to cause permanent hearing loss, *i.e.*, 113 to 117 decibels for a half of a day.

Ostersgard's testimony corroborated the claimant's testimony that the claimant had done chipping and grinding on different occasions between 1982 and 1984. Ostersgard had testified that the claimant spent most of his time in 1982 in booth 909, in which chipping and grinding on various table weldments consisted of an hour and 20 minutes per day when working on 540 front-end-loader ladders, of 20 to 30 minutes per day when working on 412 levers, and of 36 minutes to an hour per day when he worked on a bucket-lining weldment. Additionally, Ostersgard's description of the noise created by the chipping

hammer as a little quieter than a street chipping hammer and of the noise created by a pneumatic grinder as similar to a power saw further established that these operations could produce the noise necessary to cause hearing loss.

The evidence of the respondent that the claimant's noise-level survey of February 15, 1984, indicates he was only exposed to a time-weighted average of 83.8 decibels does not defeat the claimant's proof that he was exposed to sufficient noise to cause permanent hearing loss, since this figure was an average over a day's time, and there was no breakdown of the various noise levels the claimant was exposed to during the day. In addition, the noise survey done on February 15, 1984, by the respondent indicated that there were other time-weighted averages of over 91.4 decibels produced in department 330. From the claimant's description of the room as being 30 feet by 40 feet, it is a reasonable inference that he was also exposed to this level, albeit from a short distance away. Moreover, the witnesses' testimony that their work with International Harvester was the same as with the respondent, combined with the noise-level surveys done in the 1970s by International Harvester which indicated that the workers were exposed to sound-level readings of from 82 to 120 decibels, provided additional evidence of exposure to loud noise levels. We find that the claimant did meet his burden of proof in showing that he was exposed to noise levels for a period of time sufficient to cause permanent hearing impairment.

Our conclusion that the evidence presented by the claimant showed that he was exposed to noise levels sufficient to cause permanent hearing loss is supported by this court's holding in *United States Steel Corp. v. Industrial Comm'n* (1985), 132 Ill. App. 3d 101, 477 N.E.2d 237. In *United States Steel Corp.*, the claimant presented evidence that he had worked for the respondent for 20 years, that the mill was noisy, and that he and his co-workers could communicate only by shouting to each other from a distance of three or four feet away. The claimant in that case also described the noises produced in the mill. The only other evidence presented as to the noise level produced at the claimant's employment was a noise survey done approximately 15 years before the claimant's last date of exposure. The noise-level survey from 1963 indicated sound-level values of from 90 to 103 decibels at various sites in the mill. This court found this evidence presented a *prima facie* case of noise exposure sufficient to cause permanent hearing loss. In the instant case, the evidence presented by the claimant was even more compelling.

The respondent's next argument is that the Commission's decision was erroneous as the Commission relied on old noise-level surveys done by International Harvester in 1979 to determine that the claimant was exposed to excessive noise levels. The respondent asserts that this reliance was error, since these were old records of a former employer and since there were 1984 noise-level surveys in evidence which established that the claimant was exposed to a time-weighted average of 83.8 decibels on February 15, 1984. In the Commission's written decision, the Commission stated:

> "The Commission notes that Respondent objected to the results of certain noise level testing performed prior to the purchase of the plant by Respondent. However, Petitioner testified that his job remained essentially unchanged after that purchase. In *U.S. Steel v. Industrial Commission*, 132 Ill. App. 3d 101, 477 N.E.2d 237 (1985), the Court held that a Petitioner who introduced noise level studies showing that levels of noise in excess of 90 decibels existed in various areas of the mill during the time he worked for the employer and who testified that the same noise level existed during the entire time he worked for that employer, had made a prima facie showing of exposure. In that case, the noise level report was based on testing done in 1963, while the last date of exposure of Petitioner was in 1979. The Commission was permitted to rely on Petitioner's testimony and its own expertise in determining that exposure had occurred."

The respondent contends that the Commission erroneously applied the holding of *United States Steel Corp. v. Industrial Comm'n*, 132 Ill. App. 3d 101, 477 N.E.2d 237, when it made the foregoing determination. We do not find that the Commission misapplied the holding in *United States Steel Corp.*, and as was set forth earlier, we find the case of *United States Steel Corp.* analogous to the facts of the instant case.

■ Here, the claimant's testimony established that he had been performing the same work since 1978, *i.e.*, prior to the takeover of the Libertyville plant by the respondent. Ostersgard's and Webb's testimony similarly established that they had been performing the same duties for the respondent as they had been for International Harvester. The noise-level studies done by International Harvester covered work projects which included chipping and grinding, and these activities generated sound-level readings of from 87 to 120 decibels. Because of the similarity of the work under International Harvester, the Commission was entitled to rely on the noise-level surveys done

for International Harvester. Although a noise-level survey done by the respondent in 1984 was admitted into evidence, this information was not informative since, as was noted previously, the decibel levels were given as time-weighted averages. These readings did not provide a breakdown of actual levels occurring throughout the day and did not state the length of time the claimant or any other employee was exposed to a given decibel level. The noise-level surveys of International Harvester did provide a decibel level and an exposure time for specific activities performed. Further, the claimant testified that neither he nor the other employees performed tasks involving much chipping and grinding during the February 1984 noise-level survey; therefore, the results of that test were not persuasive. The Commission was correct when it determined that it was permitted to rely on the testimony given and its expertise in determining that exposure to excessive noise levels had occurred.

■ The respondent also contends that the claimant failed to show that his hearing loss was causally connected to his employment with the respondent, since Dr. Allen stated in his letter report that the time-weighted average of 83.8 decibels shown in the 1984 noise-level survey was insufficient to explain the progression of the claimant's hearing loss. The respondent also asserts that Dr. Goldstein's statement in his letter report that there was no change in the configuration of the claimant's 1981 and 1984 audiograms supports its argument that no hearing loss occurred in the claimant during his tenure with the respondent but was the result of his employment with International Harvester. This argument is without merit.

Dr. Goldstein found that the claimant had bilateral sensori neural hearing loss, and he concluded that this loss was due to noise exposure. The doctor stated in his letter that the difference in the claimant's 1970 audiograms and in his 1981 and 1984 audiograms revealed that the deterioration in the claimant's hearing loss was related to his noise exposure at work. The doctor also stated in his letter report that there was a slight decrease in the claimant's hearing acuity between his 1981 examination and his 1984 examination of the claimant.

Similarly, Dr. Allen reported that the claimant's 1970 audiogram indicated some hearing loss, but he noted the claimant's hearing became progressively worse up until June 1984, and that after June 1984 there was no significant change in the claimant's hearing loss. While Dr. Allen did not find that an exposure to a time-weighted average of 83.8 decibels was sufficient to cause the claimant's hearing loss, he further stated that he had to assume that the claimant had been exposed to louder noises at other times.

The foregoing evidence presented by the doctors' letters, combined with the claimant's testimony that his work exposed him to loud noises, with Ostersgard's testimony and Webb's testimony corroborating the claimant's testimony, and with the noise-level surveys done by International Harvester, was sufficient to show that the claimant had been exposed to excessive noise levels in his employment with both International Harvester and the respondent. The audiograms introduced into evidence revealed that the claimant had no statutory hearing loss in 1970 or 1972. The audiograms of October 1975 and March 1984 revealed that the claimant had compensable hearing loss under the statute. There was no evidence presented by the respondent that the claimant was exposed to loud noises outside of his work environment. Although some of the claimant's hearing loss occurred while he was employed by International Harvester, the evidence also revealed that the claimant's hearing continued to deteriorate after his employment with the respondent. The respondent's imposing of mandatory hearing protection in May 1984 further supports the inference that the claimant's hearing loss was causally connected to his exposure to loud noise levels while working for the respondent. The Commission's determination that the claimant's permanent hearing loss was causally connected to his exposure to loud noises at work was not against the manifest weight of the evidence.

■■ The last argument made by the respondent is that the Commission's decision was erroneous "by its failure to address the statutory requirement that disablement must be established as having occurred within two years of the date of the last exposure to create entitlement under the Act." The gist of the respondent's argument is that there was no change in the claimant's hearing loss after 1981 and, thus, the claimant did not bring his claim within two years of his date of disablement, and the Commission's determination that his last date of exposure was May 23, 1984, was manifestly erroneous. As was discussed earlier, Dr. Goldstein found that there was a slight decrease in the claimant's hearing from 1981 to 1984. In addition, there was no evidence presented by the respondent to show that the claimant's hearing loss had not changed since 1981. The claimant's audiograms admitted into evidence were from 1975, 1984 and 1986, and there was no audiogram included in the record from 1981. Further, Dr. Allen determined that the claimant's hearing had not changed significantly since June 1984, but his letter stated the hearing loss was progressive until that time. It is also significant that the respondent mandated hearing protection in the claimant's department on May 23, 1984, the date the Commission found to be the last date of exposure.

This court's statement in *United States Steel Corp.* is applicable to our conclusion that the Commission's determination of May 23, 1984, as being the claimant's last date of exposure was not against the manifest weight of the evidence. In *United States Steel Corp.*, this court stated that the Commission could have inferred "that respondent would not have given claimant the earmuffs and ear plugs if they did not serve the purpose intended, that is, to eliminate excessive noise, and because claimant began to use them for that purpose on December 10, 1978, and continued to use them thereafter, we find support for the Commission's finding of that day as the date of last exposure." (*United States Steel Corp.*, 132 Ill. App. 3d at 106, 477 N.E.2d at 240.) Here, just as in *United States Steel Corp.*, the Commission could have inferred that the purpose of the mandatory hearing protection was to eliminate excessive noise and thus the date the hearing protection became mandatory was the claimant's date of last exposure.

For the foregoing reasons, the judgment of the circuit court of Lake County, confirming the Industrial Commission's decision, is affirmed.

Affirmed.

McCULLOUGH, P.J., and WOODWARD, J., concur.

JUSTICE STOUDER, dissenting:

Respectfully, I must dissent.

In my opinion, the Commission's decision in this case was clearly against the manifest weight of the evidence. The record in this case does not support the finding of a hearing loss attributable to Dresser. Contrary to the majority's assertion, the evidence in this case did not show exposure to noise levels for the requisite period of time as set forth in the statute. The majority and the Commission ignore the specific tests of Dresser showing decibel levels below the statutory limit and instead rely on testimony that it was noisy in department 330 and that it was difficult to communicate with others when welding was being done. Such evidence is insufficient when compared with actual decibel testing done by the employer.

The majority is correct in its assertion that on two occasions the claimant was exposed to at least 115 decibels of noise. Nevertheless, the statute requires that exposure to over 115 decibels be for a period of at least 15 minutes. There is simply no evidence that the claimant was exposed to over 115 decibels for this period of time. The Commis-

sion relied on testimony that on some days the claimant performed air-arcing, an activity that in the 1970's was shown to produce a decibel level of 117. Nevertheless, the Commission and the majority ignored the fact that the claimant wore ear protection when performing that task. Therefore, this evidence could not be relied upon to show exposure for over 15 minutes. There is simply no credible evidence in this case to show that the claimant was actually exposed to noise sufficient to cause hearing loss for the statutorily prescribed time limit.

More importantly, it is clear from an examination of the record that the claimant suffered no hearing loss attributable to Dresser. The tests of the claimant's own doctor show that there was no significant change in the claimant's hearing loss between his examinations in 1981 and 1984. The claimant's 1981 and 1984 audiograms were in the same basic configuration, but with a "slight decrease in hearing acuity." This alleged slight decrease was not measured, and the 1981 audiogram was not included in the record. Although the 1981 audiogram was not available to the Commission, Dr. Goldstein referred to it in his report and relied on it in making his evaluation. Further, even a slight decrease in hearing acuity since 1981 would not necessarily mean that there was a loss attributable to Dresser, since the claimant did not begin working for Dresser until the end of 1982. The tests of Dr. Goldstein showing audiograms with the same basic configuration in 1981 and 1984 establish that there was no hearing loss attributable to Dresser.

Because I find the decision of the Commission to be manifestly against the weight of the evidence, I would reverse the circuit court's confirmation of that decision. In my opinion, the claimant failed to show exposure to sufficient noise levels for the time periods prescribed by the statute and also failed to show a hearing loss attributable to Dresser. For these reasons, I must dissent.

RAKOWSKI, J., joins in this dissent.